Case number 09-0970, consolidated bid 09-2091, Michael A. Downs et al. v. Rosenthal Collins Group, L.L.C. et al. With lawyers who can argue, please. Good morning, your honors. My name is Jeffrey Shulman. I represent Rosenthal Collins Group, the appellant, Ross Appelli. Good morning, your honors. I, Dan Schmickler, represent the appellee and cross-appellant, Michael Downs. You understand you can reserve some time for your... As your honors know from reading the briefs, we're here today on Michael Downs' claim that as a result of he being CEO of RCG from approximately August of 1997 until January of 2004, he acquired an equity ownership interest in the company. Downs alleged that that interest grew from two distinct contracts. The first one being a written employment agreement executed in 1997 when he first joined the company, which he alleged gave him a 2.5% equity ownership in RCG. The second distinct contract was approximately five years later, an alleged oral contract between himself and Mr. Rosenthal, one of the principals, in a three-minute conversation where Mr. Downs received, as he alleged, an additional 4% equity ownership interest. After a bench trial, the trial court found that despite certain requirements of the written contract, Downs did in fact have a 2.5% equity ownership in RCG, but he ruled against Downs on the oral contract on the 4%. As you saw from reading the briefs and looking at the exhibits and the transcript, the written contract said that Downs did not get a 2.5% interest just by becoming the CEO. He had an option, and his option was he could purchase a 2.5% interest if he executed a note at book value. The note at book value was, of course, never executed, and there was much testimony and eventually the trial court ruled that by three conversations that supposedly took place between Downs and Bob Collins, the other principal of RCG, RCG had either, A, waived the right or the obligation on Downs' behalf to have the note executed, or, B, made it impossible for him to execute the note. We contend that those findings are certainly against the manifest way of the evidence. The conversations, as they are detailed word by word in our briefs, were that Downs approached, according to Downs, Collins on three separate occasions. Collins denied these conversations ever took place. Can I just stop you, because we really have read all of it, because it really is a very interesting case. We've read the facts. My concern is more what the judge's ruling was based on. Did he base his ruling on a waiver by RCG of the contract terms, or did he rule that the doctrine of impossibility apply? Well, I will answer that. Our position is, and it becomes clearer the more times you read the judge's opinion, that it was impossibility. Now, I know that Downs has said in his briefs the judge was using those terms in a lay manner, but I would direct the court to the oral ruling, which is appendix A of our brief, and just in less than a page, here's what the trial court said, and I'm starting at the bottom of page four. And the contract called for Mr. Downs to possess two and a half percent of an interest in the business provided he executed a note and paid book value. It appears to me that on several occasions Mr. Downs attempted to do so and was thwarted in his efforts by the actions of the defendant. He later on in the same page says, and I don't believe that it is fair, equitable that the defendant should rely upon their failure to supply Downs with the information that he requested and rely upon that as a basis to deny that he owns two and a half percent. And then later on when he uses the word impossibility twice in the same sentence, I believe that his lack of performance was attributable to the impossibility of performance, and that impossibility was a result of the conduct of the defendant. I don't think there can be any clearer indication that he wasn't using the word impossibility when he used it twice in the same sentence, backed up by what he was talking about on the page before, that he was saying that if RCG somehow, doesn't explain how, and it's counterintuitive, by the way, from the other evidence that's in the record, made it impossible for Downs to at least tell Collins, here is what I think book value is, I'll execute the note at this amount and have Collins say to him, no, no, no. That's not the right price. Or have Downs say, here's how the note should be structured, and Collins saying to him, no, no, no, I don't like that structure. According to Downs' own testimony at these three conversations, he never proposed an amount, which as we point out in our brief took him all of 20 seconds to figure out 12 years later by his version. He never proposed the form of the note. He never said to Collins, look, if you disagree with me, let's go to Rich Horgan, who is our CFO and knows what book is. Let's look at the form 1FR, which we file every month with our regulator that tells what the book value of this company is. Let's discuss it. As he admits in his brief, he simply walked away from this obligation because he didn't think Collins wanted it done. And that is why on that particular point that you asked, Your Honor, we contend that the ruling is against the manifest way to the evidence. You're saying there was no evidence at all? I'm not saying that there was no evidence at all. There was Mr. Downs' testimony. The point is, what was Mr. Downs' testimony? Because when he says I have three conversations, and then he doesn't have any substance behind those conversations. He doesn't propose what he thinks book is. He doesn't propose the form of the note, or as I just said, he doesn't say, look, I say it's this, you say it's that, let's go see what it is. Let's go see what our CFO says it is. Let's go see what we tell our regulators what it is. And by the way, he's the CFO and a CPA and an attorney, so he should have some pretty good idea of what he thinks it is. But that conversation never took place according to Downs. So while you can debate whether there was a conversation at all, or three conversations at all, like Downs claimed, or like Collins says they never existed, you can't debate that at the conversations, as recalled by Downs, none of the terms of a note or the amount of book was ever discussed. He just walked away. And that is why in view of those conversations, the court saying RCG made it impossible, or RCG even waived it, which now the court, by the way, as you know from reading the briefs, backed out of its ruling, because if we waive the right to have Downs execute a note at book value, the judge comes around and says, you waived the execution of a piece of paper, but you didn't waive the result that the piece of paper would have gotten you. Because all a note would have done, whatever the terms were and whatever the amount was, was mean that Downs had to pay for his interest. And the court said Downs has to pay for his interest. As we point out in our brief, I don't quite see how you could waive one portion of an agreement, a written agreement, and not the other portion, when in effect it's the same thing, because it's a number. Whether you had to pay it in a year, two years, come out of profit A, come out of your own pocket, pay it immediately, you still have to pay. So the result that the court saw was the same thing, which indicates even in his ruling, it's more impossibility than waiver. As to the other parts that the court mentioned, and Downs always talks about in his brief, of the A, that he had his profit loss distribution or, as he claims, his ownership on this tab A, that's of no moment. And as the record is clear, even in that early stage, there are many, many people, at least three or four that I can recall off the top of my head, that were admittedly not owners but got a profit loss distribution out of the shares of Rosenthal and Collins. And another thing that I'm sure Your Honors saw when you read it is even Downs' testimony, and we detail it in our brief, word for word, even Downs' testimony that the second conversation he had with Collins, he comes to Collins and says, if my interest was coming out of Bob's allocation, and I wanted to pay Bob, and I could write a check to Bob, that's totally conceivable. That's consistent with everything we've heard, that the only owners, Rosenthal and Collins, each own 47.5% of RCG, have always owned 47.5% of RCG, and they cut deals with friends, family, employees, where they give those people a profit and loss distribution out of their shares or out of the combined shares, whatever deal they want to catch. That's consistent with what Downs testified. My part was coming out of Collins' allocation, not the company's allocation, Collins' allocation. I wanted to write Collins a check. I felt I owed it to him. That's consistent. The other thing Downs and the Court made some mention of, Downs really trumpets it in his brief, is that his share was profit and loss, and he would be responsible for any loss that would come off of that share. That's entirely consistent with everything. That's entirely consistent with the people who got a share in 97. That's entirely consistent with the people who got a share in 2004, namely Maureen Downs, who, by the way, has no relation to Mike Downs, and Rich Horton. They were in for a profit and loss distribution. They would get money. If there was a loss attributable that went above their share, that would be the end of it, but it would be reducing their share if the company suffered a loss in any one of the quarters or year-end. On the two-and-a-half percent, we make the arguments in our brief that as a result of the first error the Court made, that he did have a two-and-a-half percent, many other things flow. I just want to address a couple of them real quickly. I'm sorry, but you really don't have to, because if he made a mistake on the two-and-a-half percent, the rest is out. Correct. But can I just address one then? Over and above. Because I believe over and above the mistake on the two-and-a-half percent, the question would be if the two-and-a-half percent ruling was correct, which as I argue it's not, that Downs was then entitled to post-distributions after Rosenthal and Collins tried to buy him out. I'm not arguing, and we didn't argue in our brief, that maybe the offer of $100 was not fair value, but there was no negotiation. There was no coming back with Downs. And even the Court recognized that one of the ways to end this would have been to figure out what two-and-a-half percent was worth in 2003, year-end when he was fired, and say, that's it. Here's what you get. But he didn't do that. He gave a never-ending stream of distributions after both the Operating Agreement and the LLC Act say that the managing partners have the right to stop that, which they attempted to do. Everything else about the two-and-a-half percent, including whether prejudgment interest is allowed, and the date, I think is fully fleshed out in the brief. So before I have... You know, we've already read all of this stuff. We've read the record, and there's nothing... Then, if you don't have any more questions, I will save any other time for rebuttal. Thank you. Good morning. May it please the Court. Again, my name is Dan Schmickler for the Appellee and Cross-Appellants. Your Honors, this was not a decision rendered after a motion to dismiss, a motion for summary judgment, a directed verdict, or any of these levels. This was a week-long trial where the Court made factual findings, and what we've heard from RCG is a request that this Court re-weigh the evidence. Now, counsel, in response to the question from the panel, noted that there was evidence to support Mr. Downs' view. He just feels that the evidence that supports RCG's view is stronger, is better, and should have been followed. Of course, but the admission that there is competent, solid evidence that supports the trial court's finding is the end of the matter. I'm sure I don't... Your Honor, I want to stop you just like I stopped this gentleman. For me, I'd like to know, what is the Court's ruling? Is the Court ruling that there was a waiver by RCG, or GC or whatever it is, RCG, or are they, or did the Court rule that there was an impossibility of performance? Your Honor, the Court did not rule that there was an impossibility of performance. I hear you say it, but I want to know why, because in reading the record, I don't see in the judge's ruling, and I read it from beginning to end, over and over again, the word that RCG waived their right. He says your client has the 2%, and then justifies it as an impossibility of performance based upon the thwarting of the effort. Yes, Your Honor, there's a couple of things I'd like to emphasize when we're looking at this. One is, this was an oral ruling. The Court did not issue a written opinion. He spoke it out from the bench, and I would submit that under those circumstances, we can understand that in some cases, the choice of words may not have been precise. I think it's clear from the substance of his opinion what he was ruling, and certainly I would note that Mr. Donaldson never argued for impossibility in this case. This clearly was not a case of impossibility, as this Court is well aware. Impossibility is a no-fault doctrine. Two parties enter into a contract, some third cause sweeps in and prevents performance, and the Court comes in and says, well, it wasn't your fault, and it wasn't your fault. I'm going to put you back in a restitutionary way where you were when this whole thing started. And that's not what the judge did here. What he said was, it was your fault, RCG. He came to you. He tendered performance on multiple occasions. I find that based on his credibility, and I find that based on other evidence in the record. I'm happy to detail, but it's in our briefs. And therefore, I'm finding that you waived the contemporaneous execution of the matter. I know you say that, but oral ruling or not, this is my problem. He said there was an attempt to pay. You thwarted the attempt. I'm going to put you back in the places where you are. There was no waiver. That's in the ruling before he goes, he says there's no waiver by RCG. And then seems to discuss the doctrine of impossibility twice in his oral ruling. Although it's not written, he seems to discuss it twice. I mean, how do we ignore what the judge said? Well, I think, Your Honor, in two respects. I think, first of all, the court can look to the substance again of what he did, because the remedy that he awarded was not an impossibility restitutionary remedy. It was a contractual expectations remedy, which would be consistent with either waiver or estoppel. And frankly, the case law talks about these types of situations in both languages. They can say when one party causes the other party to believe that strict performance on the contract is not going to be required, some courts say that's a waiver. Some courts say that's estoppel. Either way, they get to the same place, the same place the trial court got here. I know, but this judge didn't say waiver or estoppel. The second thing that I would say, Your Honor, is that because I think when the judge says there was no waiver, he says there wasn't a waiver of the desire to get the underlying payment. There was a waiver of the necessity to execute the note at the time he received it. And so in fact, when the court, ironically, I think when the court says there's no waiver because he describes what he's talking about, what wasn't waived, I think that one can reasonably infer that he was talking about as opposed to the provisions that were waived. And moreover, of course, this court can affirm on this record, clearly there's plenty of evidence here of waivers or estoppel, however the court chooses to proceed. And the court can affirm on any basis that it sees in the record. So even if this court's troubled by the notion that the Judge Martin's language wasn't precise, this court can easily remedy that by saying, well, whatever he meant, this record is clearly consistent with a waiver of that provision. Because as we've said, the RCG went ahead and provided him with that interest. That's what the court found, as a matter of fact. And the court looked at a lot of other evidence from the negotiations for this contract, where it was undisputed. The person who negotiated the contract on behalf of RCG testified that Mr. Downs would not agree to any employment agreement that didn't give him equity. And we have not only the fact that he got it then, and then also we had a testimony, undisputed testimony, that there was no downside to Mr. Downs. That the form of the note, you heard a lot of discussion about what was going to be the form of the note. Mr. Downs testified to this, he tried. He testified there was a standard form in use for notes that was actually in use at both RCG and Prime, this not technically affiliated but somewhat friendly company, I guess you would say. They used the same standard notes, the same note he used when he executed for his prime interest. There's no question about the terms of the note, other than its amount, an amount that the RCG would not provide to him. The other factor that one can look at, in terms of seeing that this was, that the trial court's decision was based on solid evidence, is just the fact that Mr. Downs' descriptions of the conversations themselves establish it. Because Mr. Downs says that when he talked to Mr. Collins, Mr. Collins said, you know, this company runs very strange in its accounting. I don't know what book value is under these circumstances. I don't know how to compute it, I don't know what it is. And sure enough, in this case, Mr. Collins testified his deposition. I don't know how you compute book value of this company. So how, did Mr. Downs just guess that? You know, obviously that's corroboration. In fact, really see in this case, throughout the trial and throughout this appellate briefing, RCG still can't tell us what was the book value in 1997, Mr. Downs acquired his interest. We've seen half a dozen different numbers from that, in terms of could have been this, it could have been that, it could have been this, it could have been that. And never took a position, which is very consistent with what Mr. Downs says happened at the outset of these facts. One thing I'd like to clear up, with regard to the amount of this note, and I would note at the beginning, that it's not clear to me that this was our burden. It seems to me the note is an offset against our damages. We had argued below that the note in its entirety was waived, the court didn't find for us there. But we also happen to be the only ones who put in evidence of what the book value of RCG was in 1997. Now, in the appellate reply brief, RCG argues for the first time that our own expert opined that Downs' buy-in for that note could have been as much as $5 million in 1997. And that's just simply not correct. If you go to the record, where they cite that testimony, and this is in buy-in 15 of the record at page 207, Mr. Hossfield, our expert is testifying. And they shifted, you can see in the exchange there, they were talking about 2003, what was the total value, book value of the company, what would a buy-in have cost at that time. And they switched back to 1997. And it's very clear from the testimony that Mr. Hossfield, when he says $5 million, isn't talking about Downs' share. He's talking about the total book value, and 2.5% of which would be Downs' share, i.e., $125,000. And in fact, if you look in there, Mr. Hossfield says, in 1997, it's something like $5 million or something around that. And counsel asked him, let's talk about the $5 million. You take that $5 million based on the testimony of Mr. Downs at this trial, right, answer yes in part. And the expert goes on to say that he confirms that number through his own calculations. So it's clear, and counsel understood at that time, and everyone understood at that time, the $5 million was based on, was a reference to the total amount of the book value of RCG, then not the buy-in value. So there simply was no evidence about the value of this note other than what Mr. Downs provided. Now, what RCG is really arguing, below and in this appeal especially, is, look, we tricked Downs fair and square. He came to us, he said, I know they denied the conversations, but that's a matter of fact, decided by the court. He came to us and he said, I want to provide the note, and we said, no, I don't know how much the note is. You don't need to do it. Don't worry about it. And like a fool, Mr. Downs believed us. He should not have believed us, and he should have done more. There is no case that says that. There is no case that says that. The cases rather say, as one would expect, you can't trick someone into thinking they don't have to comply with contractual provision and then say, gotcha. Now, again, also in their appellate reply brief, RCG raises one other new argument. They now, they argue there, as you heard in our argument, that this was an option contract. I question whether this really qualifies, since it's part of an overall employment contract. It's part of this compensation. Certainly, the public at large is not invited to buy into RCG. But they cite a case, it's an Illinois Supreme Court case from 1930, Lakeshore Country Club versus Brand, arguing that in an option contract, there can't be a waiver of a condition precedent. And the case doesn't say anything like that. And in fact, the case says, and I quote, this is that page, I'm sorry, I don't have the page number. It says, the optionee must perform all conditions precedent to his right to purchase not waived by the optionor. Option contracts are like any other contract. You can waive a provision. And that's clearly what happened here. I just thought one other thing I would mention in this regard, you heard counsel get up here and say that the principals here constantly had these side arrangements with family and friends and that's what Downs had. There's no evidence of that in the record. That's completely new and invented and should be disregarded. Now with regard to our cross appeal, we have two issues. The first issue is that the court didn't make, basically we had a conversation here between Mr. Downs and Mr. Rosenthal, one of the principals. And they agreed, and everybody agrees that there was an agreement, sorry for that language, it's undisputed that they came to an agreement that Downs would continue working at RCG with expanded responsibilities that he had assumed in exchange for an additional 4% interest. And the court was faced with two completely contradictory versions of that conversation. Mr. Rosenthal testified unequivocally that they spoke about a profit interest and Mr. Downs testified unequivocally that they spoke about member interest, equity interest. And the court basically said, well, you say that A and you say B, so there's no contract here, which is one thing that neither of the parties had believed up until that point. Both of them agreed there had been a contract. It was just a question of what was given, what was the nature of the interest that was given. And we submit that the court under those circumstances is required to make a credibility finding and choose between those two versions of events. And the fact that witnesses had conflicting accounts of an event doesn't mean that there was a failure to make a meeting of the minds. It means one of the witnesses is right and one of them is wrong. Failing that, if the court were to find, if this court were to affirm a finding that there was no meeting of the minds, which we don't think is justified by the record, it was required in a case where there is no contract and yet there are services rendered under circumstances that are clearly not gratuitous to make a quantum merit finding. Was this the reasonable value of the services? Well, did he get the 4%? He, what he got was... Quantum merit, he got the 4%, five hundred and something thousand dollars. What he got, Your Honor, according to the court's own finding, Mr. Downs walked away from that meeting thinking he was getting an additional 4% equity interest, which would be of a like kind as the 2.5 he already had. Oh, I understand what he thought he was getting. Right. I'm saying under quantum, I can't... Quantum merit. Merit. Didn't he get, wasn't he paid the extra 4%? It's not like he didn't get. Oh, it's not like he didn't get nothing, Your Honor. Right. He got 4%. He got a profits distribution in that amount for the remaining time that he worked at the company. So he got, I'm not saying he didn't get anything. So he was paid for the work that he did? Well, he was paid something. The question is, was that the fair value of the services? Given that, I know it seems like it's very easy for us to sit here and say, he got a lot of money from that. Well, isn't it paying for services if he's only entitled to get it if the judge doesn't rule that it's equity, but it's just profit distribution? If he got the profit distribution, doesn't it stop at the time that he's fired and not go on forever? Your Honor, if that had been the court's ruling, if the court had said, you know what? I believe Mr. Rosenthal's version of the conversation. I think that they reached agreement for profit sharing. I wouldn't have an appeal. There'd be no issue here. Can you have quantum merit in perpetuity? I'm not... Because quantum merit here wouldn't require the judge to give him equity. What it would require him to find would be, what was the reasonable value of these services provided? And was it something greater than what he received? What we have here are bookends, basically. We know that the amount that he received is the low end of what his services were worth, because that's what RCG was willing to pay. And we know the high end, that Downs was willing to accept 4% equity interest for those services. So the question is, did the reasonable value of the services fall somewhere in between? Because we have a failure of contract here. We have a situation where the judge found, through accepting that finding, that there was no meeting of the minds. There was no contract. I mean, can quantum merit go into the future? Do you have a case that holds that? I don't, Your Honor. I guess, to be fair, I don't think I'm asking for that. I think what I'm asking for would be reasonable value at that time. What was the reasonable value of the services at that time? It's not that the judge would need to award him an additional equity interest, but the judge would award him damages that would be in an amount that would reflect the additional value. And did the judge do that? The judge did not do that. That's the nature of our appeal. I feel like I've gone very long. I'm happy to keep going, but I would like to have a little time. Okay. Thank you. I'll try to keep this brief short. Just a couple of points back to the 2.5%. The question of waiver and impossibility, as I pointed out, a note, you sign a promise to pay money. If the court says, you don't have to sign the promise, but you still have to pay the money, it's not waiver. It is apparent from the ruling and apparent from that structure that the court was held that RCG made it impossible for Downs to do this. And that doesn't even make sense with the record according to Downs' old testimony because the records reflect that every time they go to Collins and they argue that Collins didn't quite know what it was, Collins says, I knew where to go find the answer. I knew that Horgan knew it, and Downs knew that Horgan knew it, and Downs knew that they filed a Form 1FR every month with the regulators where book value was in it. So there was a place to go find it. If the guy says, I don't really have an idea, but I know somebody who knows it real good and will take his word, that's not waiver. The other questions in this are the timing and the evidence. I still submit, as they argued we didn't, that we didn't have the burden of proving any book value. And whatever burden we had, we argued of when the month, when the year was supposed to be. That's all in the briefs. I won't go into any of that. I'd like to move on to the 4%. The argument that was put up here is really not the argument that they advanced in their briefs. I'm not quite sure what they're trying to say. First of all, as a matter of law, you only have quantum error when you have a quasi contract. The court clearly found the only issue that was ever before the court on 4%, in four different versions of their complaint, in the trial and in their argument, was when Rosenthal and Downs met, did they agree to give Downs 4% profit and loss or 4% equity? The court came out and clearly said it was only 4% profit and loss. Therefore, Rosenthal was telling the truth. That's what they agreed to. And any of Downs' supporting evidence... But aren't those credibility determinations that the trial court makes? Yes. And the trial court ruled in our favor on that one. Now they're coming back and saying, A, the trial court didn't have some magic words, which is we detailed it here. Not only did he say all the right words before he addressed the 2.5%, as he said. Let me address the 2.5% first. And then, when he says, now let me move on to the 4%, he again says basically the same thing. I heard the testimony. I reviewed my notes. I reviewed the exhibits. We all sat through it. And here's how I see. That's a credibility determination in my view. They argue against it. So I'm going to move on to their next argument, which we had is, okay, we don't win on the judge either A, credibility, because he ruled against this, and we don't win on the fact that there's some more magic language that a trial judge has to put in there to show us that he just did what he said he was doing. We now want to sacrifice the Diaphagon Quantum Theory, a theory we never planned, a theory we never argued, a theory we never raised. In fact, a theory we argued against the trial. And I submit that right off the bat, they can't come before an appellate court for the first time and say, I got a new theory that I should have tried downstairs. Let me try this one on you. And they say, well, we really don't do that because the court could sort of hear it. But I submit, the two cases that they put in there... Remember, we've read the case. Right, but I just would like to point out to the court that the two cases that they argue in their reply brief that say that you don't have to amend your pleadings to get to a quantum error when you read the cases, as I'm sure you have, you'll find out that in both of those instances quantum error was decided by the trial court. Now, the argument was the trial court shouldn't have decided without letting them amend their pleadings but the court said, no, you really don't have to do that. In fact, one, the Slatter case, the court said that, hey, they really did have a quantum error claim in there, they just didn't title it like that. So, both of those cases, it was decided, the issue of quantum error was decided by the trial court. In this case, the trial court didn't decide the issue. It wasn't raised. They can't come forward the first time and ask you to let them have a new shot at it on a theory that was never down there. And I think the other thing is, as Your Honor probably correctly pointed out, what they seem to be asking for was quantum error in the future. They can't do that. Now they're trying to say, well, we really don't want it in the future. We really want to see if maybe in those two years that he was there, his $850,000 a year was enough for his supposed services or maybe the court should have figured, well, I'll give him three years of quantum error or something like that. There's no law to support that. There's no argument to support that. There's nothing more than we want another shot. We lost on this one, give us another shot. I submit that they're not entitled to it. That part of the trial court's ruling should be affirmed. Of course, as we argued, the 2.5% should be reversed. Unless there's any more questions, I think I've exhausted my time and anything I have to say. Thank you. Gentlemen, you have presented a very interesting case to us. There's no more argument. Because if I gave you more argument, we could go on forever. And we're not going to go on forever. We've read the case and it's an interesting case. You guys did a very good job on oral argument. Very good briefs. And we'll take the case under advisement.